Ruth J. TOWNSEND, Appellant,

v.

James Nelson TOWNSEND, Respondent.

No. 23548.

Kansas City Court of Appeals.

Missouri.

June 4, 1962.

W. Raymond Hedrick, Lillie Knight, Kansas City, for appellant.

Frank C. Rayburn, Anthony P. Nugent, Jr., Kansas City, for respondent.

MAUGHMER, Commissioner.

Plaintiff, Ruth Townsend (Miller) filed her motion to fix the custody of Sue Ann Townsend, aged 4 years, the minor daughter of herself and the defendant, James Nelson Townsend. On November 10, 1958, plaintiff had been granted an absolute divorce from defendant by the Circuit Court of Jackson County, Missouri, but the decree made no reference or order as to custody of this minor child, who at that time was nineteen months old.

These parties were married November 3, 1953, in Leavenworth, Kansas. At that time Mr. Townsend was 24 years of age and the plaintiff was three years older. This was Mr. Townsend's first marriage and Mrs. Townsend's third. The defendant has served in the United States Navy

since 1947, and now is a chief petty officer —the highest noncommissioned rank. The child Sue Ann was born May 7, 1957. In August, 1957, defendant was officially transferred to Naples, Italy. His wife and daughter accompanied him there.

Marital difficulties arose. Plaintiff in her petition for divorce, filed September 3, 1958, charged that defendant "was morose, sullen and disagreeable and constantly quarreled and nagged at plaintiff without just cause or provocation". At the hearing on the motion to fix custody which was held August 24, 1961, she enlarged her complaints and asserted that defendant frequently struck and beat her, that on one occasion he attempted to throw her out of a fourth-story window, and once forced her to submit to sexual intercourse while their 15 month old child was in her crib in the same room, crying.

Mr. Townsend admits that he "paddled her" on a few occasions but denies he ever struck her otherwise or tried to push or throw her from a window. He says she drank too much, too frequently and neglected the baby; that on occasions he came home, found her under the influence of liquor and the baby soaking wet and unchanged. He says she developed a nervous and disordered condition and consulted a naval doctor about it. Plaintiff also visited a psychiatrist years later in this country, but says he gave her a clean bill of health. Plaintiff, on occasion, visited and was acquainted with a tavern in Naples, known as Moulin Rouge. She became personally acquainted with some of the "B-Girls" there employed. After separating from her husband, but while she was still in Naples, she saw two of these "B-Girls", whom she then described as prostitutes, in the company of her husband. She learned also that these girls had spent several hours in her husband's apartment. Mr. Townsend said he needed someone to clean up the apartment and do his laundry, that he was unable to secure help from the base to do this, so he employed the "B-Girls" to do the work.

It is now time to introduce Mr. Hubert F. Miller, the present husband of the plaintiff. Mr. Miller, too, is a long time career navy man. In 1957, he was in the same unit as defendant with a rank one step lower. Plaintiff says she got acquainted with him in September or October, 1957, about one month after her arrival in Italy. She says she would see him at parties or gatherings at various places. She disclaimed having dates with him in Italy, but admits she talked with him about her marital troubles and asked his advice on the subject.

Apparently the marital strife increased. Plaintiff discussed her troubles with the chaplain. She consulted the base legal officer regarding a separation agreement. On August 14, 1958, Mr. Townsend accompanied her to the base legal officer's quarters where they examined a proposed separation agreement, made some changes and signed it before witnesses. This document contains twelve numbered articles of agreement. It first recites it is a "complete, final and effective decision of their respective rights, duties and obligations and holdings, and provisions made for the support of Sue Ann Townsend". The separation agreement provided for division of their property. Thereunder Mr. Townsend received the automobile and furniture, and Mrs. Townsend, 56 savings bonds, with a maturity value of $1400. The joint bank account ($1288.67) was deposited in trust for Sue Ann. We quote Article four in full:

"The party of the first part shall have complete and full custody and care of the minor child of this marriage, Sue Ann Townsend, the party of the second part, Ruth Jenkins Townsend, hereby relinquishing all claim to guardianship or custody of the aforesaid Sue Ann Townsend".

As soon after signing this separation agreement as government transportation was available, the plaintiff returned to the United States and took up her abode with

a Margaret Lander in Kansas City, Missouri. The petition for divorce which she filed September 3, 1958—to which Mr. Townsend filed an entry of appearance—was taken up and plaintiff was granted an absolute divorce on November 10, 1958. Her petition alleged the birth of Sue Ann "who is presently in the custody of the defendant in Naples, Italy and the plaintiff is not seeking custody of the said minor child".

At about the time of the divorce—at least in November, 1958—Mr. Hubert Miller returned to the United States on transfer to California. He stopped at New Bloomington, Ohio to visit his parents. From there he called plaintiff by telephone at the residence of Margaret Lander in Kansas City, where she was staying. Plaintiff says she had not written Mr. Miller, advising him as to her address, but in any event, he located her by telephone and talked with her. Immediately after that conversation plaintiff bought a one-way ticket for New Bloomington and went there for the purpose, she said, of visiting Mr. Miller and his parents. After visiting there for a short time plaintiff and Mr. Miller left by automobile, heading west and staying at motels, where they registered as husband and wife. They passed through Kansas City and into Bartlesville, Oklahoma, where plaintiff became ill and was hospitalized. Her condition was diagnosed as pregnancy and on December 10, 1958, she gave birth to a male child. She says this child was born prematurely by three months and she was not aware of her pregnancy until a few days before the birth. On the birth certificate, Mr. Hubert Miller was registered as the father and the child was named Frederick Kenneth Miller. Thereafter for at least two years plaintiff corresponded occasionally with defendant but never did tell him about this child. Plaintiff and Mr. Miller were married on December 20, 1958, and there is a daughter born of that marriage.

We now return to Mr. Townsend and Sue Ann in Naples. After his wife left, the child was cared for a few weeks by Mrs. Boucher, a navy wife on the base. Then Mr. Townsend employed different women, mostly Italians and Yugoslavians, for the manifold duties of baby sitter, maid and laundress. He says the services of most of them were not very satisfactory.

Defendant says he first met his present wife Mary (Marica) Kucko in August, 1958. He employed her for household duties and child care about October, 1958. She was a Yugoslavian refugee and 20 years old. After a short time she returned to the refugee camp, where she remained until defendant "brought her back" in February, 1959. He said he was required to guarantee her food and shelter in order to get her released from the camp. Soon thereafter they began to live together as husband and wife. Mr. Townsend said they planned to get married but that before a service man overseas may do so, he must receive permission from the commanding officer and that such permission is never granted until the proposed non-American bride is investigated by the American Consulate, which usually takes some time. Defendant and Mary, or Marica, were married February 20, 1960, shortly after an illegitimate child had been born to them. At the time of the trial she was pregnant and expecting a second child.

On September 22, 1960, Mr. Townsend, with his wife and two children, came to Olathe, Kansas, where he had been transferred. More than seven months later and on April 27, 1961, plaintiff filed in the Jackson County Circuit Court, her motion to fix the custody of Sue Ann Townsend. On August 25, 1961 she filed an amended motion to include the child Frederick Kenneth Miller, whom she therein referred to as Townsend. The court placed custody of this second child with plaintiff, and neither party has appealed. Therefore, the matter of his custody or status is not before us.

Evidence was heard as to the custody of Sue Ann on August 24–25, 1961. Both

parents were present and represented by counsel. The step-mother, Mary Townsend, testified in person. The proposed step-father Hubert Miller, testified by deposition. Defendant and his family at the present time are residing in Georgia. Plaintiff and her husband at the time of trial and at this time are stationed and living in Kodiak, Alaska.

After hearing and considering the evidence the trial court ruled "that the custody of the minor child Sue Ann should be and remain in the defendant James Nelson Townsend with reasonable rights of visitation in the plaintiff".

Plaintiff has appealed from the judgment and order denying her plea for custody. She says (a) there was no competent evidence to support the order; (b) it was error to hold that the welfare of the child would be best served by the award of custody to the father; (c) it was error to disregard defendant's admission that the child was being denied the right to know her own mother, and (d) the undisputed evidence shows that defendant and his present wife are morally unfit to have the custody of the child.

■ As stated by this court in Edwards v. Edwards, Mo.App., 302 S.W.2d 37, 39:

"Under the Statute, Section 510.310, subd. 4 RSMo 1949, V.A.M.S., we are required to 'review the case upon both the law and the evidence' and arrive at our own conclusion as to what disposition of the child's custody will be to its best welfare; 'due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses', and 'the judgment shall not be set aside unless clearly erroneous' ".

Such a review requires a full presentation of the facts and careful consideration of those facts.

Section 452.120, V.A.M.S. provides:

"In all proceedings for divorce or other proceedings in which shall be involved the right to the custody and control of minor children, or their services and earnings, or the management of their estates, the rights of the parents shall be equal, and neither parent as such shall have any right paramount to that of the other parent, but in each case the court shall decide only as the best interests of the child itself may seem to require".

Courts have said many times that custody of young children, especially girls, should be given to the mother, all things being equal, and if she is not demonstrably unfit. Paxton v. Paxton, Mo.App., 319 S.W.2d 280; Ballew v. Ballew, Mo.App., 288 S.W. 2d 24.

■ The evidence here shows that both plaintiff and defendant engaged in extramarital activities during the transition period leading to their present marriages. While such behavior may not be approved it does not mean that either is unfit to be a moderately good parent. Besides, in our selection of a child custodian here we are restricted to a choice between these two parents. The best interests of the child is our primary concern. Courts award such custody neither to punish one parent for bad behavior, nor to reward a parent for good behavior. We believe that as to this point the scales balance and neither parent has an advantage.

Defendant and Mr. Miller, plaintiff's present husband, have similar occupations and close to equal incomes. Each has a wife and each has or soon will have two other children to support. Based upon these facts and the evidence heard, we believe that each family has been and likely would be furnished to a reasonable extent the necessities of life. There is actually no claim and certainly no proof that either of these homes is at the present time other than a home of peace, serenity and congeniality.

■ Appellant charges that defendant and his wife Mary are unfit to have custody

of Sue Ann and that her best interests would be served if from now on she lived with plaintiff and Mr. Miller. In addition to her claim of moral unfitness, she says we should so conclude because (a) Mr. Townsend struck, beat and grievously mistreated her during their marriage; (b) Mary Townsend, the stepmother, is a Yugoslavian, who speaks broken English, who cannot and will not bring up Sue Ann in "American traditions" as completely and as well as plaintiff and Mr. Miller would; (c) Mary Townsend is a Catholic and the child is entitled to be brought up in a Protestant home and (d) The mother, rather than the father, is most influential in rearing a child, especially a girl, and it would be better for the child to be with her own mother.

The charge that Mr. Townsend beat plaintiff is disputed. Plaintiff did not so allege in her divorce petition and no witness from the Italian Naval Base or elsewhere, testified to observing visible marks of any beating on her. Moreover, it does not necessarily follow that if defendant did mistreat plaintiff that he would abuse the child and there is no evidence that he has done so. Plaintiff makes much of a letter which defendant wrote to her parents in which to them he accepted most of the blame for their marital troubles. His doing so, we think, was a considerate and courteous act.

It is true that Mary (Marica) Townsend is a Yugoslavian. She fled from that country to Italy and for a time lived in a refugee camp. She had an illegitimate child by defendant, but the explanation for their delayed marriage, namely that it took time to get consent of the commanding officer and have the Consulate investigation made sounds factually true. It is also true that she was born and is a Catholic, but by her testimony and Mr. Townsend's, it appears the family has attended both Catholic and Lutheran services and the father, upon occasion, leads them in family prayers in the home. She is willing to leave the choice of churches to her husband. In reply to an inquiry if she thought there was any important differences as to churches, she said: "I think no. Because I think all over is one God". Mr. Townsend said they had considered both the Catholic and Protestant church; that he talked with a priest about it but met with difficulties regarding his divorce. He said he and his wife had definitely decided to go into a Protestant church, probably Lutheran. In addition, for whatever it may be worth, the evidence does not show that plaintiff holds membership in any church or that she ever regularly attended one.

It is true that Mrs. Townsend speaks broken English and sometimes speaks Yugoslavian to her brother, who lives in Kansas, and sometimes to the children. At the time of the trial she had been in the United States for only about one year. She testified orally at the hearing. A reading of the record reveals that she apparently understood the questions put to her and gave intelligent answers, although her grammatical construction was far from perfect. Appellant says she should have attended school to perfect her English and learn American ways and traditions. During her year in this country in addition to housekeeping duties, she has had two children to care for and is expecting another. If on the question of instilling "American traditions" in the child is meant the character traits of honesty, self-reliance truth, frugality and industry, we think these are as likely to come from a Yugoslavian girl as from some of our present generation native born Americans. However, we do believe that other things being equal, an American born and educated mother could better rear an American child in an American community than a foreign born mother could. The scales weigh in plaintiff's favor on this point. Generally speaking, too, it is better for a child to be reared by its own mother, but it is also true that she should have her own father. She cannot in this case have both.

As we have read and considered the record in this case we are impressed, as we

think the trial court was impressed, with the candor, fairness and good sense of defendant. He has a long time good record with the navy. He told about his marital troubles with the plaintiff but did not bemean or express hatred for her. He freely discussed his prenuptial relations with his present wife but said they had already agreed to marry and explained why the marriage consummation was delayed. After the plaintiff had visited the base legal officer in Naples and a tentative legal separation agreement had been prepared, he went there with her and signed it. He has carried out and lived up to the terms of that agreement. As a wise and thoughtful father would do in his circumstances, he considered both the Catholic and Protestant churches and finally came to a conclusion.

On the other hand, some of the plaintiff's testimony strains our credulity and raises doubts as to her sense of responsibility and fairness. It is difficult for us to believe that she was six months with child and did not know she was pregnant. It is difficult for us to understand how Mr. Miller in Ohio was able to get her on the telephone in Kanses City at the home of Margaret Lander if she had not been in communication with him. We doubt if she would have bought a one-way ticket to Ohio to visit him if their earlier relationship in Italy had been purely platonic and if they had not already reached at least a tentative understanding. We think it likely that if defendant had beat and bruised her frequently in Naples she would either have mentioned it in her divorce petition or have produced some extraneous evidence of the fact. It appears to us that it was unfair and amounted to false dealing for her never to have mentioned the birth of the second child to its father, the defendant, for almost two years. Plaintiff concealed or did not reveal to the divorce court the existence of the property settlement and custody agreement. Her action in withholding a part of the whole truth amounted to less than candor and came close to misrepresentation. Certainly her action in now trying to secure custody of

Sue Ann after her signed agreement before witnesses "relinquishing all claim to guardianship or custody of the aforesaid Sue Ann Townsend" is welching on that agreement and not keeping her word. Formerly, the law permitted a mother who signed a relinquishment and consent for adoption to renounce such agreement but by statute such a document is now made final and irrevocable. In addition, it seems to us that a mother, who voluntarily leaves her 15 month old daughter in a foreign country and solemnly signs a document relinquishing all rights of custody to the father, should not be permitted to renounce such act at will, but only for very grave reasons.

No court possesses a crystal ball, endowing it with divine insight or Solomonic wisdom so that we can look into the future and see what the future of this child would be if left with the Townsends or if transferred to the Millers. We must place that custody in the light of what we know at this time. The child is just over five years of age. She has spent all of those years with her father and almost four years of it with her step-mother. Dr. George Lytton, psychiatrist, testified that he found Sue Ann to be a normal little girl in her present environment. He expressed the opinion that at this point her best interests would be served "by keeping her in her present family situation". In his judgment, removal to new and different surroundings would result in a psychiatric trauma, the extent of which could not be accurately predicted. Our courts have recognized that shock is attendant upon such a removal.

In Davis v. Davis, Mo.App., 254 S.W.2d 270, 274, 275, the court reversed a modification order which took custody of a daughter eight years of age, from the father and gave it to the mother, saying:

"The modification ordered by the trial court would change the entire pattern of the child's life and subject her to new routines and different standards of discipline. Except in cases of necessity such change is not desirable, For-

dyce v. Fordyce, supra, and we find in this record no apparent necessity for thus upsetting the established order of things. At best, the change would be in the nature of an experiment, and experiments with a trust of this nature should not be indulged. Irvine v. Aust, Mo.App., 193 S.W.2d 336".

The judgment of the trial court is entitled to great weight in resolving this matter. As stated by the court in Green v. Perr, Mo.App., 238 S.W.2d 924, 928:

"Because of the trial court's better position to observe and appraise the human factors to be taken into account in fixing the custody of a minor child of divorced parents, the appellate courts have always recognized that the trial court's decision in such a matter should not be lightly disturbed, but should rather be deferred to unless it is apparently in conflict with a clear preponderance of the evidence, or manifests an abuse of judicial discretion. Lutker v. Lutker, Mo.App., 230 S.W.2d 177; Martin v. Martin, Mo.App., 160 S.W.2d 457; Morgens v. Morgens, Mo. App., 164 S.W.2d 626".

The trial court had no difficulty in deciding the contested issue of custody. The judge did not take the matter under advisement but entered his findings instanter. Contested custody cases requiring a determination as to what is now or may in the future be for the best interests of a child are usually close. The evidence here is not one-sided or overwhelmingly one way. However, we are inclined to the view that the conclusion reached below is the right one. That court had the opportunity of hearing, seeing and observing the contestants while we can only read the cold written transcript of their testimony. We certainly shall not say that the judgment entered should be set aside as clearly erroneous.

The judgment that custody of the child Sue Ann Townsend be and remain with the defendant and father James Nelson Townsend is affirmed.

SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the Court.

All concur.