Barbara Ann McCALLISTER, Plaintiff-Appellant,

v.

James Frederick McCALLISTER, Defendant-Respondent.

No. 33501.

St. Louis Court of Appeals, Missouri.

May 26, 1970.

Richard R. Russell, Kirkwood, for plaintiff-appellant.

Hale W. Brown, A. L. Tidlund, Kirkwood, for defendant-respondent.

BRADY, Judge.

The divorce decree in question in this appeal awarded defendant a divorce upon his cross bill and granted him custody of the two children. The decree provided for plaintiff to have reasonable rights of visitation and the right of temporary custody every other weekend beginning at 10:00 A.M. Saturday and ending at 7:00 P.M. Sunday, together with three weeks during summer vacation. Plaintiff's appeal is limited to the custodial grant.

The facts bearing upon the issue of custody are somewhat hidden in this transcript; the divorce was the issue really tried. However, we can discern that these children came to the parties by adoption when they were infants. At date of trial in October, 1968 Kevin was approximately four years of age while Sharon was some twenty months. There is no real issue as to plaintiff's housekeeping or her general care of the children. While defendant testified she did neither to his satisfaction, it appears his opinion is subject to question as being without proper facts to support it. For example, that the house was thoroughly cleaned only about once a week; that the dishes were not kept washed through the day; that on one occasion he found Kevin playing outdoors on a cold day with his nose running and he put a sweater on the boy; that the children were not bathed when he came home from work; that "Half of the time they're kind of sickly and colds all the time when I pick them up"; and that during the summer months he sometimes had to go find "him" (obviously Kevin) to bring "him" home. On the other hand, he admitted he never complained to her about her housekeeping, and his witnesses stated the house was clean and the children well cared for so far as their physical requirements were concerned, and their relationship with plaintiff was good. As one of defendant's own witnesses put it, "She certainly kept them as clean as mine ever was, if not at times perhaps more so." Plaintiff's witness described plaintiff as an able and concerned mother.

There was evidence concerning plaintiff's control of and supervision over Kevin. Defendant's witnesses testified the parties lived within four houses of a very busy street which they considered dangerous for children and to which plaintiff had testified the children were not to go. One witness testified she saw Kevin on this street five or six times while the other had seen him on two or three occasions. There was also testimony Kevin is often out at about 7:00 in the morning in his pajamas either in his yard or on the street they lived on "wandering around", frequently with a bottle of soda pop. One witness testified she considered Kevin a neglected child on the basis that "* * * since he was two years old he's just been let run all day long." He also comes over in her yard and bothers her when she's gardening. Another of defendant's witnesses testified Kevin could have more supervision but seemed to be "all boy" with more "steam" than the other children. There was also testimony that when plaintiff was working until 11:30 at a hospital (following the separation) she would leave the children alone while taking the baby sitter home, a trip of some fifteen to twenty minutes duration.

Another matter that bears upon plaintiff's control and supervision of the children has to do with an occasion when Kev-

in and Jim, a boy who had just moved into the neighborhood, walked eight or ten blocks. Plaintiff had seen the boys about 2:20 or 2:30 when she gave them each an apple and they went back out to play. About 3:00 o'clock Jim's mother came looking for him. They couldn't find him and Jim's mother, understandably concerned, called the police after a neighborhood search. There was testimony plaintiff was opposed to calling the police. About 4:30 Jim's father picked the boys up a couple of blocks from the house. Plaintiff testified she called defendant about 4:00 o'clock to tell him the boys were missing. His testimony was she called him at about 5:00.

Some of the testimony as to plaintiff's affair with a Bill Friedman is pertinent to the issue here involved. Plaintiff admitted she had sexual relations with this man after the separation from her husband. It further appears that she had told her husband she was in love with Friedman during the month prior to completion of the adoption of Sharon. Defendant also so testified. About ten days after the adoption was completed plaintiff and defendant separated. Defendant testified that he had been checking on plaintiff during their separation and he had seen this man's automobile parked near her house as many as twenty times during the period from April to October, and it often stayed there until 2:00 o'clock in the morning; that on these occasions there were no lights on in the house. One of defendant's witnesses testified to the same general effect except that she went to bed at 10:30 or 11:00 when the car was still there and does not know how much longer it stayed. Defendant's witnesses testified that as a result of this affair plaintiff's reputation in the neighborhood was not good. Defendant testified that Friedman is now divorced and that he saw Friedman's ex-wife and the Friedman children at plaintiff's residence. He has not seen Friedman there but that is the inference he draws from his testimony as to the presence of the automobile in front of plaintiff's residence.

The evidence as to the parties' respective abilities to care for the children financially and otherwise is very meager. Plaintiff's evidence was that at the time the divorce action was heard she was working in Clayton, Missouri, at a salary of $350.00 per month. She works from 8:20 in the morning to 5:00 in the evening. She would take the children to the baby sitter at 7:15 in the morning and pick them up at 5:30 in the evening at the baby sitter's home. The baby sitter is a licensed practical nurse who has a nursery set up in her home and keeps four or five other children in addition to Kevin and Sharon. The children get hot meals while they are being cared for. After 5:30 she calls for the children and they go to her home where she prepares dinner. Then they play and watch television until bedtime. Her testimony was that she paid $80.00 per month for this service by the nursery. There was no description given of her living quarters.

Defendant testified that a family by the name of Thompson who have three children of their own, two of which are school age and the other the same age as Sharon, would take care of Kevin and Sharon in the event the court awarded custody to him. He did not give the amount they would charge for their services or any particulars of their care. He works from 8:00 in the morning until 5:00 in the afternoon, and gets home about 5:30. On weekends he takes the children to his father's house but his father and stepmother can't care for the children as the stepmother works all day. He testified that he makes $150.00 per week plus car expenses which sum he did not state. Plaintiff testified that her husband's income in 1965 was $9,200.00, in 1966 it was $8,500.00, and in 1967 it was $7,000.00. The only expenses he gave were the payments on his car of $126.00 per month. There was no testimony as to the physical surroundings in the home in which defendant intended to place the children for day care nor any description of his present living quarters. The only evidence as to the father's character and his concern for the children and

their mutual love and affection was the testimony of his witness that he talked to Kevin, corrected him gently and firmly when Kevin needed it, and got along very well with him.

It will do little good to comment upon the parties' action in completing Sharon's adoption when both knew the home into which they were bringing her was then, to all effects and purposes, a broken home. Both parties bear the guilt of their unconscionable action in not bringing this fact to the attention of the court approving the adoption. It is obvious that circumstance would weigh heavily with the court in determining whether to grant the adoption.

 We reverse this judgment because from this record we cannot tell whether the result reached was correct or incorrect. The facts upon which such a decision must be based were not sufficiently developed. Having in mind the ages of these children, and in the absence of special extraordinary reasons for not doing so, their interest would normally best be served by placing them with the plaintiff providing all other circumstances were equal. Stockton v. Guthary, Mo.App., 415 S.W.2d 308; Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426. See cases collected Mo. Digest, Divorce, ☞298(6). This is not a presumption of law but a recognized fact of life based on human experience. Garbee v. Tyree, Mo.App., 400 S.W.2d 193. Are there abnormal or unequal circumstances present in the instant appeal? If there are and if the welfare of the children demands it, the above cited rule will give way. Copenhaver v. Copenhaver, Mo.App., 402 S.W.2d 612.

 First, there is the fact plaintiff must work all day and therefore cannot be present to give the children the guidance they need. But that is equally true of the father. Another is the plaintiff's feeling for and actions toward and with Friedman. But the fact that she has engaged in extra-marital activities does not of itself alone mean that she is not a fit parent.

Townsend v. Townsend, Mo.App., 358 S. W.2d 271. Evidence of immorality disqualifying a parent as custodian of a child exists only when that parent's character and conduct are such that the child would probably be subjected to substantial immoral and debasing influences in the home. Stockton v. Guthary, supra. The evidence of Friedman's involvement with plaintiff and her affection for him are factors to be considered in determining her character and conduct, but in and of themselves alone they cannot be said to show such substantial immoral and debasing influences as to require denial of custody to plaintiff. There is no direct evidence going to that issue. The only evidence is the inference defendant draws from the fact Friedman was spending long and late hours at plaintiff's residence with the residence in darkness after the parties had separated. While defendant is entitled to draw certain inferences from Friedman's presence there under such circumstances, there was not even evidence the children were then in the house, although, again, that may be inferred from the circumstances. In any event, absent other evidence we cannot hold these visits establish the substantial immoral and debasing influences of which the cases speak. Neither do Kevin's escapades rise to the degree of showing plaintiff to be an unfit mother. Even defendant's evidence established he was a somewhat precocious child and that the children were well cared for.

It may be argued that our decision should be based upon the rule of deference to the trial court. While we are aware the trial court had the parties before it and perhaps was able to arrive at some judgment regarding their credibility and other similar matters from that fact and from their demeanor on the stand, we do not think that by that brief appearance some rational judgment as to their ability to take care of children and as to the sufficiency or fitness of the arrangement made for the children's care can be arrived at.

▮▮ The fault with all considerations above mentioned is that they beg the question by focusing attention solely upon the wisdom of denying plaintiff custody. If we allow ourselves to be so diverted we ignore equally pressing issues; i.e., the wisdom of placing the children with defendant or even with third parties. Yet it requires no citation of authority that custody is not a matter to be awarded upon the basis of fault between the parties as to the divorce or as an award for the behavior of one parent and a punishment for that of the other. It was not sufficient for the trial court to determine plaintiff should not have the custody of these children; it must also determine that defendant should have. It is in this respect this record is deficient. All this record discloses is that defendant has made arrangements with a family named Thompson to keep the children during the day while he works. Contrast that evidence, or the lack of any further development of the arrangements, with plaintiff's evidence as to the physical surroundings and care given the children in the nursery she provided for them. In addition, there is no evidence as to where or how the Thompsons intend to keep them (except that it is to occur in their residence) or as to their fitness to do so. In addition, it is clear defendant intends to take the children after work and keep them each evening until he goes to work again in the morning, but there is no evidence as to how or where or in what circumstances he will keep them during that time. There are many other factors which should be gone into before the custodial grant as to these children is properly arrived at. No one of those factors will be determinative but certainly a better picture of the total arrangements for the care of these children should be presented before the court can make a conscientious and rational judgment as to where the children should be placed. We think this is particularly true when we note that the children are adopted. We are well aware that the adoption having been completed the children are in all respects to be considered as the parties' natural children. Nevertheless, we think that in a realistic appraisal of the situation made in the light of the children's very tender years, a home broken before Sharon's adoption was completed, and with legal separation occurring closely (ten days) thereafter, the adoptive nature of the parental relation cannot help but be a factor in this case, at least as to Sharon. It is possible it may be equally pertinent as to Kevin.

Neither do we think the proper answer in this case is to affirm the judgment and hope the matter will be determined on a motion to modify. The effect of such a motion is to place a burden upon the movant to show change of conditions requiring modification and occurring since the custodial grant. One result of a proper grant of custody will be to determine who will bear that burden. Under the circumstances of this case it is hardly an answer to a grant awarded upon insufficient evidence to state that thereafter conditions may change. What must be determined is the wisdom of the custodial grant in the first instance.

Our reticence to reverse this judgment is overweighed by the heavy burden placed upon us to determine custodial grants purely and solely from the standpoint of what is best for the children involved. Upon retrial inquiry should not be limited to plaintiff's situation. Further development as to defendant's arrangements for care of these children is necessary if he is to receive the award. Nothing we have held herein is to be taken as requiring custody be placed in either parent or in third parties, nor should the result reached at first trial in any way circumscribe the issues. The custodial grant should be fully and completely developed de novo.

The judgment decreeing the divorce was not appealed from and has become final. Beckmann v. Beckmann, 358 Mo. 1029, 218 S.W.2d 566, 1.c. [12]570. The judgment as to the custody of these children is re-

versed and the cause remanded to the trial court with directions to hold a hearing on that issue only.

WOLFE, P. J., and DOWD, J., concur.