In re the MARRIAGE OF B———
A——— S———,
Petitioner-Appellant,

and

G——— R——— S———, Respondent.

No. 37127.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Sept. 21, 1976.

Ellsworth Cundiff, St. Charles, for petitioner-appellant.

Charles P. Todt, Clayton, for respondent.

RENDLEN, Judge.

This appeal is from the custody award of three minor children incident to a judgment dissolving the parties' marriage and from denial of appellant's claim for attorney's fees.

Appellant contends that young children, especially girls, are best placed with the mother, that the custody award was not to the best interests of the children and was against the greater weight of the evidence. Section 452.375 RSMo 1969, Laws 1973 (effective January 1, 1974) presents a nonexclusive mandatory list of relevant factors for the court's consideration in custody cases. It is argued the trial court failed to properly weigh these factors particularly the wishes of the children, the interaction and interrelationship of the children with their parents and the children's adjustment to their home, school and community.

We review the case on the law and the evidence under Rule 73.01 giving due regard to the trial court's opportunity to adjudge the witness' credibility and aware that the judgment may not be set aside unless it is against the weight of the evidence, wrongly declares or applies the law, knowing that our power to set aside a decree as against the weight of the evidence must be exercised with caution and on "a firm belief that the decree or judgment is wrong." *Murphy v. Carron*, 536 S.W.2d 30, 32[2] (Mo. banc 1976). It is clear

from the record both parents manifest a deep interest in the welfare of their children and each express an earnest desire to serve as custodian.

The parties, married in 1961, have three children, a daughter C_____ 12, and two sons, B_____ 11 and E_____ 8. We find no indication of marital strife prior to 1970 when they purchased a home in St. Peters, Missouri. Personal discord soon surfaced, followed by marriage counselling, reconciliation efforts and finally a March 1973 agreement to separate in June at the end of the school term.

Appellant, by prearrangement, moved the children and some furniture to St. Charles. Some quarreling occurred concerning temporary custodial arrangements; but the children, living principally with their mother through the summer of 1973, stayed five nights and two days each week with their father, under a plan designed to accommodate the parents' working hours. After September the children remained in the general custody of their mother, staying Tuesday through Thursday nights with her and three weekends per month with the father until the divorce in May 1975.

For eight months following the separation the husband, though requested, provided little or no support for appellant or the children, while with her stating: "He didn't see any reason why he should." In April 1974 he was ordered to pay child support of $60 per week [1] but from time to time arbitrarily deducted amounts from the weekly payments for items such as car insurance premiums for the automobile in appellant's possession and the cost of shoes or similar purchases for the children.

In February of 1974 appellant moved to a more suitable apartment less than one-half mile from her place of employment.

While at work, appellant could conveniently communicate with the children by phone and sometime before the divorce changed her hours to 6:30 a. m. through 2:30 p. m. permitting her to be with the

1. The transcript contains no account of the proceeding for allowance pendente lite and our

information comes from the testimony of the parties.

children on return from school. The respondent-husband points out she could not be with the children at breakfast but the evidence shows breakfast for the children was arranged each morning before she left, the children's clothes laid out and plans made for the day. Further, as the mother explained, the money she received was insufficient to adequately care for the children and she needed to work. It seems unbecoming to fault appellant for this effort; and if the father feels strongly she should not work, which requires her to be away during the children's breakfast time, this could be readily remedied by increased support payments. As the husband also works, neither can legitimately argue the other's disqualification as custodian because of their respective employment.

The living accommodations of each are suitable for the children; and while the jointly-owned home in St. Peters occupied by the husband is more commodious than appellant's apartment, the court has ordered the home "divided equally between the parties," presenting a problem for his custodial claim.

Appellant permits the children to have friends in the home for meals and overnight stays. Appellant entered both sons in little league baseball and attended most if not all of their games. She also enrolled the younger son in cub scouts, bought his uniform and furnished the monthly dues.

The children keep numerous animals and the only difficulty in this area developed when, without consulting the mother, the father delivered a rabbit that was unsuitable as a pet. A more serious problem occurred when the father, aware of the children's love for their pets, attempted to poison their minds against their mother, saying if the children lived with her they would not be permitted to have animals and she will marry somebody who is "real bad."

Witnesses for appellant included the fifth grade teachers who testified that B_____ was punctual, as clean and neat as other children, participated well in activities, was well-disciplined, courteous and respectful and although at the beginning was not working up to his grade level, improved after appellant's conference with the teachers. Neither of these teachers had ever seen the child's father.

E_____'s third grade teacher described his manner of dress and personal appearance as much like other children in the class, and though he had been below his grade level in some areas, several months after the conference with his mother E_____ also improved academically. Further, he was not a discipline problem, treated the teachers with respect and was apparently a very normal child.

An employee of the Howard Johnson Restaurant had seen the children on numerous occasions and stated they appeared normal, clean and neat. Having observed the children with their mother, the witness testified: "She disciplined them but never mistreated" them.

The minister of the Calvary Evangelical Methodist Church of St. Charles where appellant had attended for a year confirmed that the children attended Sunday school and church regularly when with the mother and she attended regularly at other times. He also testified the mother and the three children were clean and neat in their appearance. This testimony concerning the children's appearance and conditions in appellant's home were generally corroborated by the father's witness, Mr. Darrill Beebe, a social worker for the St. Charles County Family Services.

Though the husband charged the children were dirty and their clothes torn when they came to him on weekends, this evidence came exclusively from him and his mother who admitted attempts to persuade the children to choose her son, the respondent-husband as custodian. Respondent and his mother produced a number of articles of dirty and torn clothing claiming they were those of the children but appellant stated she had not seen most of the items and the clothing she provided the children was usually kept at her home and that provided by the father at his.

During the trial, in March 1975, the parties agreed the court should examine the 12

year old daughter and the 11 year old son. The 8 year old child did not appear in the chambers. The testimony of that examination is most revealing and important to our decision.

## TRIAL COURT'S INTERVIEW OF THE CHILDREN

The 12 year old daughter explained she was doing better in school as time went on and described living conditions at the home. She stated a part of her job was to take the clothes to the laundromat, fold them and bring them home where her mother usually ironed them.

She testified her brothers played outside a good deal and would get dirty and this was true whether at her mother's or father's home. The clothes the children wore at the mother's or father's house were the same or similar.

She also described matters of grave concern to this court. The father-respondent has repeatedly attempted to poison the minds of the children against the mother. The following responses to the court's non-leading questions tell us much about the parties:

Q. "Has anyone tried to influence you as to whose custody you should be in?"

A. "Yes."

Q. "Who has done that?"

A. "My father."

Q. "What has he done in that respect?"

A. "He tells us that *my mom is no good* and if we live with her *I won't have any animals* and *she will marry somebody real bad* and *they will beat us* and *everything and stuff like that.*"

Q. "How often does he do this?"

A. "Mostly every weekend when we come out there."

Q. "What are your feelings toward your father and your mother?"

A. "Well, I like them both and everything. It's just *I get sick of hearing my dad talk about my mom, criticizing her and stuff and I don't like it.*"

Q. "Does your mother or anyone in the household than your mother say anything critical of your father?"

A. "*Never.* Sometimes, you know, say something like tell her that he called her a name or something and she will say, 'I don't want you talking about your father like that.' She won't let me talk about it." (Emphasis ours.)

The child stated that she would prefer to stay with her mother and felt that spending three weekends a month with the father was too much as she would prefer to spend more free time with the mother.

The court then asked her if she had seen anything improper at the mother's or father's home to which she answered that at the father's home the grandmother "has taken over the place of a mother and I don't think she should," and further that:

"And every time I ask if I can go somewhere I always . . . my dad always goes, 'Ask your grandmother,' and I don't think its right because if we have to live with him, all she should be used for is a grandmother not a mother."

The court then asked concerning matters she might consider improper in the *mother's* home and she answered that she gets tired of having chicken all the time stating: "My mom gets chicken all the time and I go over to my dad's house and we have chicken and I'm tired of chicken but I like it still." Pressing this inquiry, the court asked concerning improper associations of either parent with other men or women. The child answered: "My dad never goes out or anything and my mother goes out about once a week and I don't think it's very bad," going on to explain that during the first months of the separation her mother went out only occasionally, returning usually about 11 o'clock and a baby sitter was always employed. The court then asked:

Q. "All right, do you know anything about your mother having . . . whether she did or did not associate with other men during the time your mother and father were living together. Did you know anything along that line?"

A. "No."

Q. "You did not ?"

A. *"My dad tells me that she did but I don't know.* I don't think she did." (Emphasis supplied.)

He then directed attention to the matter of morals asking if she had observed anything immoral in the conduct of either the mother or the father to which she answered that her mother and father "don't get along together."

The daughter related that on one occasion her father pushed her mother against the bookcase and she started crying and when her mother got up he started pushing her again.

On the subject of cleanliness she explained that they had to take baths at her father's house and at her mother's house she took "showers and wash my hair." As far as the children getting dirty and playing she said "we don't have to change clothes unless we go to somebody's house because they are always dirty from playing."

Q. "Is this the same whether you are at your father's or mother's?"

A. "Yes."

When asked her personal preference she expressed a desire to live with her mother.

The court then examined the 11 year old son who stated he was making fairly good grades in school, that he was being well-taken care of in both homes, but at his dad's house "we got to get dressed up and everything to go places and stuff and over here we don't just have to get all dressed up and everything." He also stated his father tried to influence him as to which home he should prefer:

Q. "And what has your father done or said to try to influence you?"

A. "He says my mom doesn't take near as much care as my dad and he says he keeps—he watches over us and stuff and my mom doesn't hardly do that."

Then he stated that his father does "keep an eye on us more" than his mother does. He said his mother tried to influence him by "getting me stuff and—and taking us some places."

■ It is incumbent on the trial court conducting interviews under § 452.385 RSMo.1969, Laws 1973, to avoid the role of advocate. Impartiality is an indispensable ingredient and the vulnerable child must be protected from any sign of bias. While the court rarely abandoned its neutral stance, only occasionally leading the child toward harmful information concerning the mother, the questions were answered fully and forthrightly, lending credence to the contention the mother has been a good parent who strove to protect the children's feelings and relationship with their father. In contrast, the father attempted to prejudice the minds of the children.

From the record the husband appears a strong-willed person whose persistent, self-serving and often nonresponsive answers tell us something of his personality. Similarly, his mother Mrs. A____ S____ demonstrated a strong personality, admitting attempts to influence the children's custodial preference and it is she whom the husband would bring to occupy the role as mistress of the house. This maternal grandmother, 66 years of age, claims to be in good health but admits she is taking tablets for high blood pressure and occasionally suffers from arthritis.

Darrill Beebe, who at the court's instance conducted an investigation and home study, testified as to child-parent relationship, living arrangements, financial and general fitness of each parent as custodian.[2] In his opinion the father was too strict with the children; there was evidence he has used a belt and at times threatened its use as a disciplinary measure, had pulled the children's hair and "thumped them hard with his knuckles on top of their heads." "He becomes very angry when they disobey or do not mind and often disciplines in a fit of anger by physical reaction or verbal abuse." As Mr. Beebe described it, Mr. S____ was an "over firm person. Very strict. Perhaps more strict than desirable." Appellant aptly stated: "You can't raise children on

2. By stipulation the home study was admitted as evidence.

bitterness and hate." Respondent admitted some of these things but stated they were done in a very limited way. Appellant had stated her children's well-being is more important to her than anything else in the world and Beebe's report shows "she feels that they are happier with her since they are close to many friends in the neighborhood and school." In his opinion "Mrs. S——— seems to possess a deep understanding and insight into the respective needs of the children." His comment concerning the father was:

"[H]e tends to lack insight into the needs and feelings of his children . . . He does not appear to have understanding of their individual motivation."

\* \* \* \* \* \*

"His behavior in the past has shown a limited ability to understand the children's respective personalities and motivate them in ways other than harsh discipline. The children have expressed a desire to be with their mother, and the worker feels this is quite significant. Since the children have shown no major disruption in their lives other than poor appearance and some rowdiness due to lack of discipline, it is felt that the present arrangement with their mother should be continued."

His decision was based "upon observations of her insight into the children's needs and her ability to provide a happy, stable home in which the children appear to be very secure."

The father, challenging the mother's suitability, points to the fact she admitted extramarital affairs with seven men during the period 1973 through 1975, though none occurred at the home and the children were unaware of any of the intimacies. Mrs. S——— admitted the affairs to Mr. Beebe and again at trial, stating they occurred

while the parties were married and at least on two occasions before the separation. During her cross-examination there was some confusion as to statements made in deposition but at trial the witness frankly admitted her intimacies and the record belies respondent's contention these include other men whose names she could not remember.

Respondent admitted his daughter preferred to stay with appellant but charges the children were neither clean nor properly clad by her. This contrasted sharply with testimony of independent witnesses, i. e. the teachers, the minister and the restaurant employee. Though the father and maternal grandmother insist the children bathe more often and are better clothed when with the father, it seems apparent both parties provide adequate clothing, hygienic conditions and suitable homes.[3] Interestingly, after the separation the mother on three occasions went to the father's home and gave it sorely needed cleanings.

The father's conduct was not above reproach as he admitted calling his wife a "whore and a bitch" and in one instance grabbed her and threw her in the bookcase only leaving when she threatened to call the police. These episodes seemed to spring from jealousy or temporary rage, provoked by her dating other men. On the other hand Mrs. S——— complained that he showed very little affection during the years of their marriage. Appellant admitted her intimacies with other men but believed her dating during the separation of almost two years did not adversely affect the children. She conceded that from time to time her "dates" called to see her at the home and one of them occasionally had meals there. No acts of adultery were committed in the home or in the presence of the children.[4]

---

3. The husband testified the younger son became ill, called him at work and he took the child to the hospital. Learning this, the mother went to the hospital complaining she should have been notified. It eventuated the child was neither hospitalized nor seriously ill and the occurrence has no strong bearing on the case.

4. A friend of appellant, one G——— B——— driving "through" on a trip to Glenwood "was supposed to be there the night before but they didn't get in . . . And since he didn't show up the night before I didn't figure he was coming and at 5:30 he was at the door, stopped on his way through. Stopped to say hello and they were going right on. I had to go to work.

Generally it is recognized a mother is deemed to be the one best able to care for a child of tender years. *S.G.E. v. R.L.J.*, 527 S.W.2d 698, 703[4] (Mo.App.1975); *Johnson v. Johnson*, 526 S.W.2d 33, 37[7] (Mo.App.1975). Adultery or promiscuity standing alone is insufficient to stigmatize a mother as an unfit custodian. The relevance of such activity is its effect if any upon the child. *In re Marriage of Cook*, 532 S.W.2d 833, 837[9] (Mo.App.1975); *McClarnon v. McClarnon*, 528 S.W.2d 795, 796[2] (Mo.App.1975); *Klaus v. Klaus*, 509 S.W.2d 479, 481[9] (Mo.App.1974). As previously discussed, there is no evidence the children were aware of the mother's adulterous conduct but she did display some affection, including greeting friends with a kiss and holding hands at the home. There was no showing of adverse effect on the children nor is this the type of conduct occurring in *L.H.Y. v. J.M.Y.*, 535 S.W.2d 304, 307[9] (Mo.App.1976), in which the mother "has permitted her affairs of the heart and body to interfere with her taking care of her own son." Cases dealing with this issue have spoken in terms of the children's awareness of the parent's immoral conduct and while we find no evidence of intimacies occurring in the home or in the presence of the children, this is not to say the morals of a parent are not a factor to consider in awarding custody, *V.M. v. L.M.*, 526 S.W.2d 947, 949–50[6] (Mo.App.1975). However, except for appellant's affairs with men other than her husband, she has not been shown an unfit mother or disqualified as custodian. The children have lived with the mother during the two years of separation and the pattern of custody should not lightly be discarded. Though the father enjoyed regular extended periods of temporary custody, appellant-mother has been the primary caretaker and custodian of the children all their lives, responsible for their health, personal and educational needs. Significantly, respondent tacitly agreed appellant should retain the primary custody at the time of the separation in June of 1973, through the 1974 proceeding for allowances pendente lite and until the time of dissolution. *See Zigler v. Zigler*, 529 S.W.2d 909 (Mo.App.1975).

As previously noted, a mother is generally viewed with favor as custodian for children of tender years. "[T]his is not a presumption of law but a recognized fact of life based on human experience." *McCallister v. McCallister*, 455 S.W.2d 31, 34[2] (Mo.App.1970). "Any departures from that usual award of custody have been described by this court as . . . 'aberrations from normalcy' . . . where such variance occurs 'there must be a finding, evidentially supported, that the best interest and welfare of the children are served by a departure from [a] normal pattern of family relationships.'" *S.G.E. v. R.L.J.*, *supra* at 703[4]; *Baker v. Baker*, 475 S.W.2d 130, 133[2] (Mo.App.1971). Since the separation appellant has maintained a home, supported and cared for the children with little assistance from her husband during the first eight months. She has provided supervision for school work, little league, cub scouts, church and Sunday school. Finally, while the extramarital affairs of the mother are to be condemned not condoned, it is intolerable the father should systematically seek to foster disrespect and destroy the children's affection for the mother. This can be a ground for denying custody to the father as continued association of children with both parents, wherever not forbidden by harmful circumstances, is desirable and to be strongly protected. *See Hensley v. Lake*, 274 S.W.2d 493, 495[3] (Mo.App. 1955), stated somewhat differently, "conduct of one parent which seeks to instill fear, disrespect or hatred of the child for the other is most strongly condemned. It is sufficient ground for ordering a change of custody." *S. v. G.*, 298 S.W.2d 67, 76–77[13] (Mo.App.1957). As stated in *Kaplun v. Kaplun*, 227 S.W. 894 (Mo.App.1920): "It is of that age when most sensitive to influence, and no argument can arise over the proposition that it is detrimental to the child to have any one, especially its father, speak

I had to be to work at 6:00 o'clock." She was dressed in a "heavy" nightgown and visited

with him for about five minutes in the children's presence.

abusively and disrespectfully of its mother." The court in *P.D. v. C.S.*, 394 S.W.2d 437, 445[10] (Mo.App.1965), discussed the matter in these terms:

"[O]ur courts so severely condemn any conduct on the part of one parent which is calculated to, or has the effect of, instilling in the child fear, disrespect or hatred for the other parent that it frequently is said that such conduct may be sufficient to justify and require a change of custody [cases cited] regardless of whether or not the condemned result is intended by the offending parent."

The fact the husband's efforts here have not produced estrangement does little to commend the conduct.

Considering the record in its entirety, we feel the best interests of the children will be served if they remain in the custody of their mother. Our reticence to reverse is outweighed by the primary burden to determine what is best for the children. We find the trial court erred awarding custody to the father and the judgment as to custody is reversed and the cause remanded. The court is directed to enter judgment awarding the general care, custody and control of the minor children to appellant and that respondent may have temporary custody on alternate weekends from 9 a. m. Saturday until 6 p. m. Sunday, on alternate legal holidays and for one continuous month during the summer months so as not to conflict with the children's school schedule. That the parents be admonished neither should by word or act attempt to instill fear, disrespect or hatred for the other in the minds of the children. That the cause be opened for further evidence on the issue of child support and the court make such orders for support as may be proper thereon.

Finally, appellant contends the trial court erred in failing to grant her attorney's fees, expenses and costs. A primary consideration, with other relevant factors for allowing attorney's fees, is whether the claiming party possesses sufficient means to prosecute the suit. *Larison v. Larison*, 524 S.W.2d 159, 161[11] (Mo.App.1975); *L.J.S. v. V.H.S.*, 514 S.W.2d 1, 9[15] (Mo.App.1974);

*McGinley v. McGinley*, 513 S.W.2d 471, 473[7] (Mo.App.1974). If a sufficient disparity of means to pay appears, a party, here the wife, may look to the other for payment of attorney's fees, *McGinley v. McGinley, supra.* Though the joint property consists of $6,000 equity in real estate plus household goods, the husband listed savings of $124, life insurance with $600 cash value, an automobile worth $2,000 (contrasted with appellant's $200 Datsun) and take home pay of $781.24 compared to appellant's net monthly pay of slightly more than $320.

Appellant seeks $1,215 additional attorney's fees having been previously allowed $250. We reverse and direct the trial court enter its order allowing appellant $500 for attorney's fees.

The cause is reversed and remanded for further action to carry out the orders herein contained.

SIMEONE, P. J., and GUNN, J., concur.