Alwal A. B. MOORE, Plaintiff-Respondent,

v.

Meda Ruth MOORE, Defendant-Appellant.

No. 32939.

St. Louis Court of Appeals.

Missouri.

June 14, 1968.

Fred M. Joseph, Clayton, Gerald J. Bamberger, St. Louis, for defendant-appellant.

Roberts P. Elam, St. Louis, for plaintiff-respondent.

CLEMENS, Commissioner.

The defendant wife, Meda Moore, appeals from the denial of her motion to modify the divorce decree that gave her husband, Alwal Moore, custody of their two sons, age 13 and 7. We affirm.

Soon after the divorce the father began —or possibly continued—a not-too-discreet courtship with Mrs. Betty Jean Frederick; they were married six months after his divorce and five months after hers. This new relationship provoked the mother's motion to regain full custody.

The original decree granted the divorce to the mother on her cross-bill. Since she had been in ill health and could not then care for the boys, the court accepted the parties' agreement and placed the boys in their father's custody, subject to liberal temporary custody with the mother. She has exercised those rights fully, having the boys with her for overnight visits every Wednesday, on alternate weekends, for four weeks in the summer during school vacation, and on specified holidays.

The mother's brief opens with a challenge to the scope of our review, contending we may not weigh her evidence but should merely rule on its sufficiency, as a matter of law. We disagree. At the hearing on her motion to modify, only the mother offered evidence. The trial court then granted the father's oral motion to deny the mother's motion to modify. The mother says we should accept her evidence as true and give her the benefit of all favorable inferences. Conversely, the father contends we should make our own findings of fact as in any non-jury case. This conflict springs from the unorthodox disposition of the cause in the trial court. (The trial court called the father's oral motion a "motion for directed verdict," but of course it was not.) Counsel argued the oral motion for judg-

ment and the court—obviously weighing the evidence—commented: "There is some evidence with respect to improved condition of health of Mrs. Moore. There is no evidence before the Court of any substantial value with respect to any detriment in the welfare of the children at the present time or that would affect their morals. The only items before the Court in that respect would be based upon speculation and conjecture * * *."

■ The scope of our review is unchanged by the fact that the trial court based its ruling entirely upon the mother's evidence. This, because she had the burden of proof. The original decree raised a rebuttable presumption of the father's continuing fitness as the boys' custodian; on the motion to modify, the mother had the burden of persuasion—to convince the trier of fact by her evidence that changed circumstances affecting the boys' welfare clearly called for a transfer of custody. (Birrittieri v. Swanston, Mo. App., 311 S.W.2d 364 [2, 7].) When the mother's evidence was all in, the trial court was not so persuaded. Denial of her motion at that time was a finding against her on the facts; it did not concede the verity of her evidence. So we follow Civil Rule 73.01(d), V.A.M.R., and review the case upon both the law and the evidence. Although we make our own findings of fact, we may not disturb the trial court's ruling unless it is clearly erroneous. (Irvin v. Irvin, Mo.App., 357 S.W.2d 254 [5].)

There are three prongs to the mother's motion to modify: that she has regained her health, that after the divorce the father lived immorally with a woman in the same household with the boys, that the boys are not getting the parental care she can give them. She testified herself and produced evidence from numerous friends and relatives, from the parties' 13-year-old son and the father's 13-year-old stepdaughter. Cross-examination was extensive and vigorous. Following are the facts as we find them.

For a year before the divorce the mother had been in poor health, using extensive medication—mostly tranquilizers and sedatives. This made it hard for her to keep house and fully care for the boys. Soon after the divorce she began to recover and is now physically capable of caring for them.

Most of the testimony concerned the father's relationship with Mrs. Betty Frederick, now his wife. She had been a family friend; she frequently visited the Moore home, often with her four children. The Moore home was on his 100-acre farm in St. Louis County, where he operated a wholesale and retail egg business. Shortly before the divorce the father began seeing more of Betty Frederick, usually in the company of family friends or his or her children. When the father and mother separated, shortly before their divorce, he stayed on at the farm home with the boys; she moved into a three-bedroom apartment. A month after their divorce Betty Frederick was divorced from her husband, and she and her four children moved to a residence some twenty miles from the father's house. His courtship of Betty intensified. During the next several months she was often at his farm, usually with her children who attended the same elementary school as his sons. Betty cleaned the house from top to bottom and began redecorating and remodeling it to accommodate both his and her children. As their marriage neared she and her children often stayed there overnight. At these times Betty slept in the house with her children, and the father slept in another building on the farm with one or more of the boys. Several weeks before their marriage Betty went with the father on an overnight business trip to Kansas City. The children were but vaguely aware of this trip, and nothing about it suggested any wrongdoing to them.

The boys' home life with their father and stepmother is wholesome. Spiritual training is given. Family recreation is

regular. Without prompting, all the children speak of "Mom" and "Dad". The boys' moral, physical and psychological needs are well filled. The farm home is large, with five bedrooms. It is near a school bus route. Although the boys readily visit with their mother, by their words and conduct they show a preference for the present arrangement. Their relationship with their stepmother is good; she cares for them and her own children without partiality. She is never critical of the boys' own mother and tells them they were good friends. The boys' relationship with Betty's four children was best described by her 13-year-old daughter. Asked how the six children got along at the Moore home, she said: "We love it, we have a lot of fun." Asked whether they had any "little disputes," she said: "Yeah, once in awhile. We make up and go on and have fun." We find that the boys are happy, healthy, well cared for and adjusted to the only home they have ever known.

Much of the mother's evidence was directed to her allegations about inadequate care. On these charges we find: Although their clothes and bodies were sometimes dirty, this was school and farm dirt, and the boys got all the clean clothes and bathing that boys will accept. Although the mother complained that the boys' school attendance and grades were not good, their few absences were excusable and their grades were satisfactory. She found fault with the younger boy not wearing his eyeglasses; for a while he had lost them, another time they had to be changed, and he did not want to wear them anyway. The mother complained that the father let the 13-year-old boy operate a power riding mower even after he had once been injured. The boy had bruised his ankle, but with her knowledge he had been using a power mower since he was eight. We do not belittle the mother's concern for her sons' welfare. But since a choice of homes must be made—and giving consideration to the mother's broad

temporary custody rights—we find the boys' welfare is enhanced as much by masculine association with their father as by the highly solicitous care of their mother.

■ The mother stresses the effect of the father's conduct with Betty Frederick —from the time he was divorced to the time he married her. We view that evidence not to measure it by public moral standards, but to consider its effect upon the boys' welfare. As seen by the boys, their father's association with Betty Frederick showed no more than a demonstration of their mutual affection, leading up to their married life together in the family home. This conduct, therefore, does not lead us to a conclusion that it will adversely affect the boys' welfare. Isolated moral transgressions do not make a parent unfit; thus, even a "bad" person may be a "good" parent. Such conduct is but one of the factors bearing on the ultimate issue of children's welfare. The trial court properly viewed this evidence in that light. (L——— v. B———, Mo.App., 305 S.W.2d 713 [2]; Paxton v. Paxton, Mo.App., 319 S.W.2d 280 [14]; Stone v. Stone, Mo.App., 378 S.W.2d 824 [6].)

The mother raises two points about excluded evidence. The proffered testimony was cumulative and hardly relevant. Accepting it as true would not materially affect the merits.

■ In child custody cases the trial judge rarely enjoys the luxury of deciding between a good choice and a bad one. More often he must make a decision between two poor choices or, almost as difficult, between two satisfactory choices. His decision is often influenced by the character of the parties and by their witnesses— factors more apparent to him than to us. The rule of appellate deference to trial court decisions is unassailably sound. Here, we cannot say the trial court was clearly wrong in concluding that the mother's evidence failed to show that a change

in custody will advance the boys' welfare above its existing status.

The judgment denying the motion to modify will be affirmed.

PER CURIAM.

The foregoing opinion of CLEMENS, C., is adopted as the opinion of this court. Accordingly, judgment is affirmed.

ANDERSON, P. J., and RUDDY and WOLFE, JJ., concur.