J., Plaintiff-Respondent,

v.

R., Defendant-Appellant.

No. 8854.

Springfield Court of Appeals.

Missouri.

Sept. 25, 1969.

Esco V. Kell, West Plains, for defendant-appellant.

Patrick O. Freeman, Jr., Thayer, for plaintiff-respondent.

HOGAN, Presiding Judge.

This is an action to modify the custody provisions of a divorce decree. At issue is the custody of the parties' son, a boy of seven at trial time. The trial court has awarded general custody to J., the child's father, subject to the right of R., the mother, to have custody on alternate Satur-days and for a period of one month during the summer. The defendant mother has appealed.

Plaintiff and defendant were divorced on April 12, 1963. Their son was then almost three. The decree was granted to the defendant and she was awarded custody of the child, plaintiff being given the right to have custody of his son for a period of two months during the summer and the right to have the child in his home one day each week. After the divorce, both parties worked, the father at his trade as a barber, the mother as the operator of a small grocery store. During the time the child was in the defendant's custody, his day-to-day care and supervision was left to the maternal grandparents.

This motion to modify was filed in December 1967. The substance of the motion was that the defendant, though single and unmarried, was pregnant with child; that the pregnancy was the result of one or another of the "illicit and clandestine love affairs" which defendant had been "carrying on" with men, and that defendant's licentious behavior was having a deleterious effect on the welfare of her child. The defendant filed an answer and counter motion, and the plaintiff filed a timely reply. On January 30, 1968, the case came before the court for hearing. At that time the defendant filed a verified application for a continuance, attaching and incorporating therein a statement from a physician that she was approximately seven and one-half months pregnant, "with estimated date of confinement March 19, 1968." The physician stated that he had advised against a court appearance for defendant before April 1, 1968. Upon plaintiff's representation that he believed defendant might try to remove the child from the jurisdiction, the trial court heard some evidence and entered a temporary order transferring custody of the child to the plaintiff and his present wife, but deferred a hearing on the merits.

The case was finally heard on May 17, 1968. Before the hearing began, defend-

ant, by her counsel, admitted of record that she was single and unmarried, and that she had conceived and delivered a child out of wedlock. It was further admitted that defendant's illegitimate child was in her custody, and the evidence shows that the second child was living and being cared for in the home of the maternal grandparents.

A number of matters were developed on trial, but the force of the plaintiff's evidence was that defendant was an unsuitable custodian of her child because of her unchaste and licentious living, which had eventually resulted in the birth of an illegitimate child. A number of specific episodes were recounted by various witnesses. Mrs. S., who operated a motel in the community in which the parties lived, testified that about two years earlier she had had a male guest, known to her to be married, with whom R. had regularly associated. Late in the afternoon, the guest would return from work, defendant would join him, and they would drive away together. On one occasion when the married guest was not in, defendant asked Mrs. S. to give him a message. Mrs. S. remonstrated with the defendant, stating that the male guest " * * * [had] a wife, he is married." Defendant answered, "Yes, but they are not living together." Mrs. S. asked the guest to have defendant stay away from the motel, and later the male guest's " * * * wife came and got him when the work [he was doing locally] was over."

A Mrs. E., who was once employed at the same factory as defendant, testified that on one Friday evening in a nearby town, R. had stopped to pick up a different man, known to the witness to be married, and the two had driven off together. Another witness, a Mr. T., recalled having seen R. together with yet another married man in an automobile in a remote and secluded area late in the afternoon. The two "drove off" as the witness approached, but he recognized both of them. Other episodes, less persuasive but of the same general nature, were testified to.

The defendant vigorously denied any improper conduct. Concerning the male guest whom she had met at Mrs. S.'s motel, defendant testified that she had believed him to be unmarried; he had told defendant that he " * * * was divorced and [had] showed me the papers proving it." Defendant denied her association with the man referred to by Mrs. E. and denied that she had ever met the man Mr. T. said he had seen her with. As we have said, other matters were developed, but it is unnecessary for our purposes to recite all the evidence in detail.

■ Relying on the well-established rule that a custodial order made in connection with a decree of divorce can be modified only upon proof of a change of conditions showing that a modification is in the best interest of the child, State ex rel. Shoemaker v. Hall, Mo., 257 S.W. 1047, 1053 [7]; P———— D———— v. C———— S————, Mo.App., 394 S.W.2d 437, 439 [1], the defendant maintains that there was no showing of a change of conditions sufficient to warrant a modification of the original order. The defendant argues that the only thing which was really proved was that she became the mother of an illegitimate child; otherwise, she says, no fact or circumstance has been shown which would indicate that she is an unfit custodian of her child. In this connection, the defendant calls our attention to a number of cases which hold that neither past misconduct nor isolated moral transgressions necessarily indicate that a parent is an unfit custodian of his or her child, e. g., Moore v. Moore, Mo.App., 429 S.W.2d 794, 797 [5]. We agree that while the moral standards of the respective parents are always an appropriate subject for consideration in a child custody case, M———— L———— v. M———— R————, Mo.App., 407 S.W.2d 600, 602 [1], the reason for inquiring into the morals of the parents is to determine how the parent's character, conduct, surroundings and outlook on life will affect the child, and thus occasionally the courts have said that a "bad" person may never-

theless be a "good" parent. Moore v. Moore, supra, 429 S.W.2d at 797 [5]; I_____ v. B_____, Mo.App., 305 S.W. 2d 713, 718 [2].

Conceding, however, that isolated moral transgressions do not necessarily make a parent unfit, and that we do not sit in imperfect judgment of the litigants with a view to punishing them for their past transgressions, we cannot agree that the evidence is insufficient to warrant a change of custody in this instance. Though it is often done in these child custody cases, we believe it would serve no useful purpose in this instance to restate all the testimony in detail and consider all the inferences which could reasonably be drawn therefrom. It is sufficient to say that the trial court could reasonably have found that, over a period of several years, the defendant had dates, or "ran around," with men who were already married and could have no legitimate interest in her; that her neighbors in the community found her conduct improper and sometimes offensive, and that as a result of her improper association with these men she conceived and bore a child out of wedlock. This, in our view, is sufficient to show that the defendant was an unfit custodian of her child. It was not necessary that any specific act of sexual incontinence be shown. Roaden v. Roaden, Ky., 394 S.W.2d 754, 755 [2]; cf. J. v. K., Mo. App., 419 S.W.2d 461, 465 [5].

Stressing the rule that no single consideration is more important than the surroundings and home environment in which the child will live, In re I. M. J., Mo.App., 428 S.W.2d 18, 21 [2]; H_____ v. D_____, Mo.App., 373 S.W.2d 646, 654 [7], the defendant deprecates the actual effect of the change of custody ordered in this case. The defendant is at pains to point out that her son has never been present when she went on dates; that there is no evidence indicating that he will be subject to substantial immoral or debasing influences if he is returned to his previous home, and defendant argues that the change

of custody is in effect nothing more than a move from the home of the maternal grandparents to that of the father's parents. In any event, she argues, the child will remain in the same community in a home and surroundings not markedly different from the one from which he has been removed.

It is conceded that the maternal grandparents, with whom the child has spent his early years, are upright people of good character; it does appear that the boy is a happy, healthy youngster who is developing normally, and it is true that both parties and their parents live in the same small, wholesome community in extreme southern Missouri. In fairness, it must be said that there does not appear to be a great deal of difference, physically, between the home of the maternal grandparents and the home in which the child now lives.

Nevertheless, even setting to one side the persuasive evidence that defendant has been guilty of unchaste and immoral conduct, we cannot agree that there is no reason for a change of custody. In the first place, though it is quite often true in the case of very young parents that a choice of custodians is actually a choice between two sets of grandparents, the fact remains that grandparents should not have to resume the challenge, problems and anxieties of parenthood. Though custody of a minor child may properly be awarded to an otherwise qualified person of advanced years, young children should be cared for by individuals who are in good health and are of such age as those who normally bear children. In re K's Adoption, Mo.App., 417 S.W.2d 702, 711–712; In re G_____, Mo.App., 389 S.W.2d 63, 69 [14]. Moreover, children should be placed with a parent or custodian who will give them as much attention as possible, rather than leaving them in the care of relatives or strangers while attending to business. Sartin v. Sartin, Mo.App., 349 S.W.2d 705, 711 [8]; 2 Nelson, Divorce and Annulment, § 15.11, p. 237 (Rev. ed. 1961). Whatever the de-

velopment and accomplishments of this little boy may be, they are no doing of the defendant's. Though economic circumstances may have required the defendant to work, the record facts reflect no necessity for her choosing an employment which, from April 1963 to November 1967, kept her away from her child "from about 7 in the morning until dark" six days a week, while her child "stayed with my father and mother where we live." The defendant did rather unconvincingly state that *since* April 1967, she had tried to keep up with her child's school activities—"as close as I can" —but on cross-examination she admitted that she had been to the school only once during the school year, on Halloween. During the time she had general custody of her son, defendant was with him "[f]rom maybe 7:30 or 8 o'clock [P.M.] until bed time." She had insisted on having him on Sunday, "[b]ecause that was my only day off," but she had not taken him to church for at least a year before trial time. Moreover, the existence and presence of the new child is a consideration which must be taken into account. Defendant stated upon trial that she had no plans to work, but she offered no explanation how she intended to support herself and her new child except to intimate that she would continue to rely on her parents' generosity. We cannot predict the future, but there are limits to the burdens which can or should be imposed upon the maternal grandparents. They are people of limited resources and capabilities; the maternal grandfather has a heart ailment, and he and his wife are now attempting to operate the defendant's grocery store. Finally, we think there is merit in the plaintiff's suggestion that the presence of an illegitimate sibling in the home will create an emotional problem for the boy; children are not insensitive to, nor do they escape the consequences of, their elders' misconduct. Removal from the defendant's home will not spare the child from embarrassment and confusion, it is true, but it may alleviate his difficulties in this respect.

■ By contrast, the evidence indicates that the plaintiff father now has his own home, though he does not own it. He has remarried, and while that in itself is not a sufficient ground to award or deny custody, H————— v. D—————, supra, 373 S.W.2d at 654–655, the proposed stepmother in this case is acquainted with the child, has had, contrary to defendant's assertion, experience with little boys, and wants the child in her home. Plaintiff and his present wife work, it is true, but they will be able to spend several full days each week with the child. The evidence indicates, as plaintiff argues in his brief, that the boy enjoys his companionship with his father and stepmother, and that in his father's home he will have the stability and security of a proper family unit. The accusation of impropriety leveled against the plaintiff by the defendant—that he occasionally drinks a glass of beer, that he has once or twice taken his son with him to the pool hall, that he has allowed the family dog to sleep with his son—are, in our view, contrived and trivial.

■ Finally, we note that the defendant has in fact overstated her case. Even though she now has another child to support without means of doing so, even though she has foolishly brought herself in bad repute with some of her neighbors, and even though she has neglected her duties as a mother, she has not been found wholly unfit to have access to and custody of her son. The trial court's decree grants her the custody of her son in her home on alternate Saturdays and for one month during the school vacation. In this respect, the trial court has been more tolerant than we might have been, had we heard this case in the first instance. It is true that we review these cases de novo, and the findings of the trial court are not binding upon us, but the findings of the trial court are not to be lightly disturbed, and will be deferred to unless we are firmly convinced that the best interest of the child requires a different disposition. Harwell v. Harwell, Mo.App., 355 S.W.2d 137, 142–143

[8–10] ; I_____ v. B_____, supra, 305 S.W.2d at 720 [8]. We could not, in any view of the evidence, say that another or different disposition of this child's custody would better serve his interest. The judgment is in all respects affirmed.

STONE and TITUS, JJ., concur.