Joan CLOUSE, now Compton, Appellant,

v.

James C. CLOUSE, Respondent.

No. 27864.

Missouri Court of Appeals,
Kansas City District.

Dec. 27, 1976.

John C. Milholland, A. J. Anderson, Harrisonville, for appellant.

Edward J. Murphy, Inc., Butler, for respondent.

Before TURNAGE, P. J., and WELBORN and HIGGINS, Special Judges.

ANDREW JACKSON HIGGINS, Special Judge.

Appeal from judgment which modified divorce decree with respect to custody of children and allowances for their support. The principal question is whether the movant-father met his burden to show, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the children or their custodian and that the modification is necessary to serve the best interests of the children. § 452.410, RSMo 1973 Supp., effective January 1, 1974. Reversed.

Joan Wiley and James C. Clouse were married August 25, 1957, and were divorced June 25, 1973. Prior to entry of the decree, the parties entered into a separation and property settlement agreement and agreed, "subject to the approval and judgment of the Circuit Court," that care and custody of the parties' minor (adopted) children, James Bradford, born November 11, 1963, and Jennifer Suzanne, born June 4, 1966, shall be granted to Mrs. Clouse with Doctor Clouse to have the right of reasonable visitation; and that Doctor Clouse would pay Mrs. Clouse for child support $500 per month per child, and for alimony $500 per month. The parties also acknowledged the jurisdiction of the court to make subsequent or additional orders concerning custody, child support, and alimony "upon a legal change of circumstances that would merit such order and judgment of the court." They also agreed to a settlement of a number of personal properties, including automobiles and stocks and two tracts of real estate, and to a trust to be funded primarily by Doctor Clouse to pay for college education for the children. The decree found the agreement to be fair to both parties and it was incorporated into the decree. After hearing evidence, the court awarded a decree of divorce and custody of the children to Mrs. Clouse with reasonable rights of visitation to Doctor Clouse; awarded Mrs. Clouse a judgment of $500 per month per child for support of the children and $500 per month alimony.

This proceeding was tried on Doctor Clouse's motion to modify, filed August 13, 1974, and subsequently amended. In Count I he sought transfer of custody of the minor children to himself from Mrs. Clouse, alleging, "there has been a substantial change of circumstances in that prior to * * * remarriage, [Mrs. Clouse] did so conduct herself in an immoral and amoral manner as to subject the children * * * to an improper and unhealthy environment; that [she] frequently and repetitiously permitted a male friend to stay at her home and did so conduct herself as to live with her present husband prior to her remarriage on November 9, 1974. That [he] is willing and able to provide a proper and suitable home for the children and that it would be in the best interests of said children for said custody to be changed." In Count II, "in the alternative and in the event the court shall deny his application for transfer of custody * * *," he sought a modification of the support judgment "relieving [him] of the obligation of paying $500.00 per month for each child * * * and permitting [him], in the alternative, to establish a $500.00 per month trust for the future educational benefit of said children and thus to reduce payment * * * of the sum of $500.00 per month for both children." He alleged "there has been a substantial change of circumstances * * * in that [Mrs. Clouse] has obtained employment and is earning in excess of $500.00 per month, * * * has now remarried, and is financially able to contribute to support of said children," and the judgment awarded is

"excessive and unnecessary," and "investment of $500.00 per month in a trust account * * * can be made at this time at great financial savings to [him] for the benefit of his children and at no financial loss to [her]." In Count III, he sought termination of the alimony award.[1]

Hearing on the motion was accorded February 1, 1975. Movant presented his case by calling Mrs. Compton as a witness and testifying in his own behalf.

Mrs. Clouse [Compton] was not employed at the time of the divorce, but became executive secretary of the Clinton Chamber of Commerce February 22, 1974, at a salary of $5,500 per year. She has since been increased to $6,700 per year. Her take-home pay is about $456 per month. She also receives $100 per month as secretary of the Henry County United Way. She went to work to rehabilitate herself and to supplement her family's income. She belongs to Beta Sigma Phi and Junior Progressive Federated Women's Club which meet once a month; she does not attend regularly. She has one night meeting each month with the Chamber board and with the Chamber's retail committee.

She has been out of state on four occasions, at which times the children "were left in the care of reliable people." One of the trips was over a weekend in Acapulco, Mexico, with three other girls when, on a Wednesday, her son was left with Mrs. Sue Cochran and her daughter was left with Mrs. Betty Moore until their father received them on Friday for the weekend; another was a 9-day trip to Spain when the children were left with their father; a third was a 9-day trip to Florida with the children; and the fourth was a week in Colorado "with my work attending an institute" when the children stayed with their father. She had a check for venereal disease following an incident of sexual intercourse during the trip to Spain. She was hospitalized "for a D & C" during which she had an IUD birth control device inserted. "I always lived

under the assumption I could have no children, and after I was divorced I found out that I could."

Mrs. Clouse began dating Mr. Compton in August, 1974. He stayed in her home "the week prior to the marriage * * * and we were well chaperoned [her father was also there] * * * he stayed there two or three times before * * *." When asked if her daughter Jennifer, age 8, had called Doctor Clouse and reported she was watching her make love to a man on the couch, Mrs. Compton replied, "I don't believe that * * * because she has never seen me make love to a man, married or single." She "slept with the children" when Mr. Compton was present in the home prior to her marriage to him.

She has but an occasional need for baby sitters because her working hours permit her to be home when the children return home from school. Mr. Compton is now in the home during the summer months because his work is seasonal and he will be home during summer months.

Mrs. Compton uses none of the $1,000 per month child support for her personal benefit or the benefit of her present husband. She kept her child support, alimony, and personal income in one account, and kept a separate account for Mr. Compton. Her own account had a current balance of "about $380," and she had "probably $200.00 worth of bills at home." With respect to saving some of the $1,000 per month she receives for child support, she stated, "I would love to do that if I think I ever can."

Among the persons Mrs. Compton has employed as baby sitters were a lady about 60 years old, her 78-year old father, Leslie Wright, age 15 or 16, and Sandy Smith, age 15. She was aware that Sandy had had some problems with drugs, but "felt like if I could show her I had some faith in her, perhaps it would help her a little bit." She never had any drugs around the children and is not now involved with drugs.

---

1. The parties stipulated the marriage of Mrs. Clouse to Mr. Mike Compton on November 9, 1974, and that the judgment for alimony was thus terminated.

During the same time, Doctor Clouse had also been to Acapulco, elsewhere in Mexico, and to numerous medical conferences. He did not, on such occasions, ask to take the children with him.

Mrs. Compton detailed her spending for the children in a number of months, e. g., March, 1974, $1,832.01; April, $1,655.61; May, $1,438.13; June, $1,607.16; July, $1,351.37; August, $1,965.14; September, $1,440.35; October, $1,656.59; November, $1,162.76; December, $2,106.60. They live in a clean home, have nearly everything they want, and she spends as much time with the children as they need. Their father takes credit for the children on the income tax returns, and the joint return of James C. and Joan Wiley Clouse for 1972 showed his gross income for 1972 at $102,973 and his net income at $64,000. She believed that he was making more money at the present time. Her needs for the children have not changed since the divorce, and they now require more money to meet a cost-of-living increase of 14 to 20 per cent.

Dr. James C. Clouse took a position " * * understanding when I paid her $1500.00 a month, that that was for her to take care of the children. * * * and when I began to see the mother who was supposedly going to take care of her children began to work, began to take trips, I began to get calls from the children. One time I went over when a baby sitter was there. We knocked on the door and said, 'Where are the children?' The baby sitter didn't know. We drove around to the back and the little girl was up on the roof. Brad was at a filling station. She did not know where they were. I felt at that time that it was necessary to see that my children were cared for, and that is when I began to petition the Court * * * for custody * * *. Also during that time, one evening about 11:00 o'clock I got a call from Jennifer. She said, 'Daddy, I am watching Mother make love with someone on the couch.' I said, 'Jenny, where are you?' She said, 'I am upstairs on the balcony.' So I encouraged her to go back to bed, that everything would be all right, and I felt in my mind that regardless of what was going on * * * that it was probably a problem that needed to be looked into." He disagreed with his wife's claimed expenditures for care of the children, and felt she should be able to care for the children on less than $1,000 per month. One of his "main" concerns was to get the children through high school and to prepare them for higher education, the cost of which he thought to be "somewhere around $50,000.00" for a bachelor of arts degree in a private school; in "Harvard or Yale or one of the Eastern schools * * * you are talking today in terms of maybe $87,000.00 * * * and for me to arrive at a needed amount of money * * * I will have to put away approximately ten to $12,000.00 a year." When asked to state what relief he was seeking by way of his motion to modify, Doctor Clouse stated, "The relief I am asking for is not to decrease my payment to the children, but merely a reallocation of the money * * * I would like to pay her $500.00 a month to feed and clothe my children, then I would like to have $500.00 a month allocated that I could put in a trust fund to be used for educational purposes only" and "if they elect not to go to school, * * * this money would be divided up equally to the children for their use and benefit."

Although indicating a temporary cut in income to underwrite expansion of his clinic, his net income for 1973 and 1974 was approximately the same as that in 1972.

He stated that he bought the children toys and clothes "which I usually keep at my house because the clothes that are sent over usually aren't good enough to take them some of the places I take them. I furnish their drugs. The salesmen give physicians samples, so I am really not out any money for the drugs."

Doctor Clouse had taken the children "to Kansas City several times to do post-graduate work," and to St. Louis "where I spoke at an Emergency Physician's conference. I can't remember exactly, but I have taken them several times with me when I have gone out of town." Doctor Clouse, upon a:

unidentified occasion, asked his son "if he would like to live with me, and Bradley said, 'Yes.' * * * Brad has expressed the idea that he would like to live with me when he is 12 years of age, and I have told him, 'Bradley, I am not pressuring you. I want this to be a hundred percent your decision, because any time you would like to live with me, if we can arrange it, I want you here because you are my son.' * * * I feel a father and son should be together." As to Jennifer, "I asked her last night, I said, 'Jennifer, now we are going into a little conversation in the courthouse about the possibility of your moving with us and the Judge might possibly ask you if you would like to live with us.' " Her reply was, " 'Yes, I want to live with you because Mama is mean to me.' I asked her what she really meant by that, and she said that her mother wouldn't allow her to play with another little girl. * * * the children have never experienced any beatings, anything bad like that, but I feel that they have been neglected to the point that when a child says he would like to live with the other parent, it is something to be considered."

On cross-examination, Doctor Clouse acknowledged that the separation agreement had already obligated him to pay for the education of the children, "but I would like to * * * provide a new contract * *." He thought he could not save $10,000 a year toward college education for his children despite his income of some $108,000 due to his expenses. He acknowledged that Mrs. Compton's expenses had also risen, but asserted, "She now has a husband to help her with her problems." He did not, however, "ask him for any duties to my children, I would rather him not spend a penny of his money on my children. That is why I want to get my children."

Doctor Clouse, now age 39, remarried within three months after his divorce from Joan. The new Mrs. Clouse is 24 years old, and she and Doctor Clouse took trips together prior to their marriage. They also took Bradford and Jennifer along, and they slept together with the children present.

They did not have intercourse in front of the children, but the children knew that the adults were sleeping together.

Doctor Clouse felt it was neglect for Mrs. Compton to leave the children with young baby sitters. "I was under the assumption when we agreed on this contract * * * that verbally this contract has been broken * * *." When asked whether he was coerced into signing the separation agreement, he replied, "I am sort of like everybody else, when you really want out of a situation you pay a little blue sky * *."

Doctor Clouse acknowledged that his ex-wife kept the children clean; and, although he mentioned rumors to the contrary, he had no personal knowledge that the home was anything but clean. The visitation arrangement provided in the divorce decree had "been a workable relationship."

At the time of the divorce, Mrs. Clouse received a 1972 Chrysler Station Wagon which she traded for a 1974 Monte Carlo when upkeep on the older car exceeded payments on the new. Doctor Clouse had a 1973 pickup truck and a 1973 Cadillac. He has since sold the truck, bought another, traded for a 1975 Cadillac, and bought a Porsche.

In addition to maintaining his practice, Doctor Clouse is studying for a specialty in nuclear medicine. He also has investments in farms and has rental properties.

Mrs. Sue Cochran was a visitor in Mrs. Compton's home three or four times a week in the year prior to the hearing. She described the home as "a lovely house; it is well kept; it is beautiful * * * definitely clean." She had never observed any mistreatment of the Clouse children, their needs were met, they were happy and well-adjusted. Her son is Bradford's best friend. She heard her son and Bradford discussing a trip that the boys had made to Springfield with Doctor Clouse. They had been "hollered at" by Doctor Clouse's wife-to-be, and they didn't think it had been a pleasant weekend. The boys stayed in one room and Doctor Clouse and his friend stayed in another. "It was hard for me to explain

* * * to my child. * * * At the time they left I didn't know that this was going to be the situation." She would not have allowed her son to go if she had known the arrangements in advance.

Cecil Wiley is the father of Joan Wiley Clouse Compton. His daughter and Doctor Clouse were married when they were in Drury College before he went to medical school in Kansas City. While he was in medical school she worked as a secretary and her money put him through medical school. He has visited in his daughter's home and has lived there for short periods during recuperation from illness. He observed the Clouse children to be clean and supervised. He knew "there was a man stayed there a time or two but he slept by himself. She slept with the children."

Joan Wiley, a cousin by marriage of Joan Wiley Clouse Compton, was a schoolteacher. She had observed the Clouse children while at school and noted they were clean, well-mannered, and well-disciplined. She had been in the Compton home recently and on a number of occasions. The home was clean and the children were "happy, loving children," getting excellent care. They did not want for anything.

Joan Wiley Clouse Compton testified also in her own behalf to relate two conversations with the children about their father. He "left town and got married one weekend and the children became quite upset about it and Brad said, 'Well, Mother, the only thing good about it, I am tired of seeing them sleep together when they are not married. * * * It also has been very difficult for me to relate to my daughter that it is improper for you to sleep with a man before you are married, because she has seen it done elsewhere * * *."

The court modified the original decree to vest care, custody and control of James Bradford Clouse in James C. Clouse, subject to weekend visitation and care, custody, and control for the month of July in Joan Compton, for which month the father shall pay $300 to the mother for the son's maintenance; and to continue care, custody and control of Jennifer Suzanne Clouse in Joan Compton, subject to weekend visitation and care, custody, and control for the month of August in James C. Clouse, with the father to pay $300 per month except for the month of August to the mother for the daughter's maintenance. The court also recognized the continuing obligation under the decree of the father to prepare for the higher education of the children; and awarded plaintiff's attorney $500, recognizing same as a part payment and that Mrs. Compton has the ability to pay any balance due him for his services.

The case is for review upon both the law and the evidence with due regard to be given the opportunity of the trial court to have judged the credibility of the witnesses. See Rule 73.01.3(a), (b), V.A.M.R., and its construction, *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976).

The foregoing detailed statement of the case, viewed as required by the rule, demonstrates that the judgment in modification of the divorce decree is erroneous.

Section 452.410, supra, provides:
"The court shall not modify a prior custody decree unless it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child."

Section 452.370, RSMo 1973 Supp., provides similarly:
" * * * any decree respecting maintenance or support may be modified * * * only upon a showing of changed circumstances so substantial and continuing as to make the terms unreasonable."

When custody of children is once adjudicated (by the decree of June 25, 1973, in this case), it is presumed that the custodian remains suitable and the burden of proving a change in circumstances as to call for a change of custody is on the party seeking the change. Children should be transferred from one environment or custodian to another only where a change of

circumstances is such that the welfare of the children so requires. *Klaus v. Klaus,* 509 S.W.2d 479, 481[1–7] (Mo.App.1974).

As grounds for a change of custody (Count I), the father alleged that the mother, since the divorce decree and prior to her remarriage, conducted herself in such an immoral and amoral manner as to subject the children to an improper and unhealthy environment; that she frequently and repetitiously permitted a male friend to stay at her home, and did so conduct herself as to live with her present husband.[2]

There is no finding of fact referable to the foregoing allegations. Such is understandable in view of the absence of proof of the allegation.

With respect to the mother's alleged immoral and amoral conduct, movant offered only his hearsay testimony of a telephone conversation with the 8-year-old daughter of the parties. The observation attributed to Jennifer is fraught with ambiguity which the father himself recognized by his speculation or "feeling" that "regardless of what was going on," there was "probably a problem that needed to be looked into." The inconclusive nature of this isolated incident was not clarified by other testimony of the father, nor was there any resort to the provisions of Section 452.385 to ascertain "relevant matters" within the child's knowledge.

■ The credible evidence in this instance came from movant's other witness, the mother, for whose credibility he vouched and by whose testimony he is bound. *Shepard v. Harris,* 329 S.W.2d 1, 4[1] (Mo. banc 1959). Mrs. Compton denied the suggested implication of the child's telephone call and explained the separate sleeping arrangements made in her home when male visitors were present. She was corroborated, also, by the testimony of Cecil Wiley who was shown to have been present in the mother's home in the period under scrutiny.

■ Mrs. Compton admitted a sexual experience while on a trip to Spain, and her subsequent medical examination. It is beyond question that the incident occurred when the children were with their father in Missouri. Such an isolated incident which occurred outside the presence and knowledge of the party's children is not a change of condition or showing of immorality as to support a change of custody. *McPherson v. McPherson,* 447 S.W.2d 791, 793[2, 3] (Mo. App.1969). See also *Moore v. Moore,* 429 S.W.2d 794, 797[5] (Mo.App.1968); *McCallister v. McCallister,* 455 S.W.2d 31, 34[3] (Mo. App.1970).

The evidence shows that two men stayed at the mother's home prior to her marriage. One was her present husband; the other her father. Mrs. Compton, still movant's witness, explained that Mr. Compton stayed at her home the seven days preceding their marriage and on two or three prior occasions; that they were "well-chaperoned" at all times; that when Mr. Compton was there, she slept upstairs with the children; and that her father was present most of the time. Indeed, it appears that her father is the "male friend" that she "frequently and repetitiously permitted" to stay at her home. Again, Mrs. Compton was corroborated by the testimony of her father. He was not cross-examined, nor was his credibility questioned.

The judgment contains a finding that a modification is necessary to serve the best interests of the son, James Bradford Clouse. The only evidence from Doctor Clouse on the issue is his expression of concern for the children's higher education, an obligation he already has, his feeling, and his hearsay statement attributed to the son. The substantial evidence on the best interests of both children came from Mrs. Compton's side of the case. It showed that both children were happy, living in a clean, nice home, doing well at school, and were well-adjusted, well-supervised, and well-disciplined. The court must have believed this

---

**2.** The remarriage of both parties and the mother's employment were not pleaded as changed circumstances in themselves, and evidence of those circumstances was offered and received only as it related to the grounds alleged.

to be the case; otherwise, the daughter could not have been continued in the custody of her mother. Similarly, the court's action in continuing the daughter in her mother's custody implies an absence of immoral or amoral conduct as to subject the children to an improper and unhealthy environment.

■ In Count II of the motion to modify, the father sought to be relieved of the obligation to pay $500 per month per child for child support, and to be permitted, in lieu of such obligation, to establish a $500 per month trust for future educational benefit of the children and thus to reduce the monthly payments for child support. As grounds for the change prayed, the father alleged, as changed circumstances, that the mother had become employed; that the judgment for child support was excessive, and that the children could be adequately supported by payment of a total of $500 per month for support and by investment of $500 per month in a trust account for future educational needs.

The only evidence adduced on this count was from Doctor Clouse when he testified: "The relief I am asking is not to decrease my payment to the children, but merely a reallocation of the money. * * * The thing I petition and beg for, in the interest of my children's future education, is, I would like to pay her $500.00 a month to feed and clothe my children, then I would like to have $500.00 a month allocated that I could put in a trust fund to be used for educational purposes only * * *."

The court reduced the child support judgment from $500 per month to $300 per month, and recognized, as per the original decree incorporating the separation agreement, that movant already had the obligation to educate his children.

In these circumstances, the court exceeded its jurisdiction because it adjudicated an issue in a manner inconsistent with the pleadings and evidence. By his own testimony, plaintiff sought only a novel "reallocation" of the money previously ordered paid as child support instead of a reduction in child support. Instead, the court entered an order alien to the issue presented by the pleadings and evidence and, therefore, beyond its jurisdiction. *Dickey v. Dickey,* 132 S.W.2d 1026, 1032 (Mo.App.1939); *Poole v. Poole,* 287 S.W.2d 372, 374 (Mo.App.1956); *Lambert v. Lambert,* 222 S.W.2d 544, 548 (Mo.App.1949); *Clark v. Clark,* 300 S.W.2d 851, 852 (Mo.App.1957); *Hughes v. Wagner,* 303 S.W.2d 181, 182, 184[2] (Mo.App.1957).

■ Nor does the record impel this court to order a reduction in child support. The father is shown to be making as much or more money than he was at the time the decree was entered; and there is no showing of an inability to continue to meet his obligations. True, the mother has since become employed, but she has also remarried and lost her alimony of $6,000 a year, a sum which is no more than offset by her earnings. The needs of the children have remained the same or increased and their father continues able to meet them.

■ Appellant complains the court abused its discretion in limiting the suit money judgment which decreed that she would have to pay the balance of her attorney's fees from her own means. The record shows only the hours spent by the attorney and that the judgment was for $500, with an implication that Mrs. Compton might be further obligated. Such record is not adequate for this court to further consider the matter.

Judgment in modification of custody and child support reversed; judgment for attorney's fees affirmed.

All concur.